And at this time, we'll hear Thelwell v. City of New York. Thank you. Good morning, Your Honor. May it please the Court. We represent Winsome Thelwell, the plaintiff appellant in this case. And we are here on three issues relating to the granting of summary judgment dismissing Ms. Thelwell's dismissal claims for failure to promote to two positions. And also, for rulings that were made during the trial of the retaliation claim that was allowed to go forward that we feel were harmful to Ms. Thelwell's presentation of her case. Ms. Thelwell is a longstanding employee of the City of New York with an exemplary record. There is no doubt about it. She's worked there for more than 20 years. She had a good reputation within the agency until Laura Edding became her direct supervisor. Laura Edding, a white woman, came in and branded Ms. Thelwell the stereotypical angry black woman. She did not use those words, but she repeatedly described her as being angry, being confrontational, and made up a lot of accusations against her that were simply not true. She never drew a distinction based on race. I'm sorry? She never drew a distinction based on race in so many words. She does not need to do that. The cases from this circuit and elsewhere make it clear that when you use comments such as angry, comments that are, even on the face of them, race neutral, that you still have to look at the context under which those statements have been made and go to the issue of intent. Did she use the word angry? Oh, yes, she used the word angry. She said that she was repeatedly angry. She accused her of being always angry. But is it correct that she did not use that word until after the promotion? No, that is not correct. That was actually a statement that was made even before the promotion for the DEDI position, you know, was made. There were meetings, actually, that took place between. I thought she first made the statements about angry on March the 26th, and the promotion occurred a few days before that, no? Which promotion? There are two promotions. The first one. The first one. Well, it continued. It overlapped. But it was certainly made before the second promotion. Right. But it wasn't made before the first promotion. Am I right? I believe that the discussion, it wasn't made, yes, before the first promotion, but it continued, you know, shortly after that. Right. The point, you know, here is that all through the relationship, which the judge credited that Laura Edding treated the plaintiff harshly, but then decided that it did not really matter. That could have been on the basis of just personality. It could have been on the basis of anything apart from race. But that is an issue for the jury to decide. Well, okay. Leaving that aside, don't we have to look here really closely at whether there was another basis for her, whether the other prerequisites for her to succeed to get past the motion would apply here. And my concern here is whether there was, at least in the case of the first promotion, a legitimate nondiscriminatory reason to put McCormick in the job. There were actually a dispute as to, there is a dispute as to the reason why the promotion was made for the investigative policy. Isn't it such a dispute that would cause a reasonable juror to hesitate? I mean, it seems to me here this fellow was, they created a position for him because he had policy chops. And he had done an extraordinary work on many of these cases and the Occupy Wall Street group in cases. And he was an exceptional employee. So why isn't that a legitimate nondiscriminatory reason? He happened to be white. It is, on the face of it, the way you presented it, Kobe, but the point here is that there is a dispute as to who made the decision. And the testimony was that the final decision maker, according to the board, the board chairman, Mr. Chu, was that the executive director, Ms. Thompson, made the decision. But Thompson testified that it was the board that made the decision. But so what? I mean, isn't what you have to show that Ms. Ediden played a role in the decision? Regardless of whether Thompson made the decision or the board, your argument is it was Ediden who was manifesting racial bias. So you have to show Ediden played a role, right? Well, we show that Ediden played a role.  Because of Ediden's animus towards Ms. Tellwell. Yeah, but animus isn't enough. What role did she play in the promotion? Well, she is the supervisor of both Ms. McCormick and Ms. Tellwell. And the way the testimony came out was that for the investigative decision, when it comes to issues of promotion, that Ms. Thompson, who is the executive director, was not involved directly and would have cleared with the head of that division, which is Ms. Tellwell. And given Ms. Ediden's view of Ms. Tellwell, we contend that- There's no direct evidence of that, is there? I mean, you're just speculating about that. No, I'm not speculating, Your Honor. There is direct testimony that when it comes to running the investigative- She didn't make a recommendation, Ediden, did not make a recommendation about the promotion, did she? Well, there was no explicit recommendation, but there was a discussion clearly about the performance of Mr. McCormick vis-a-vis Ms. Tellwell between Thompson and Ediden. The point you are making here is that if you look at the record- I thought the evidence was, and I thought there was no dispute about this, or let's put it this way, that there was nothing to indicate otherwise, that Ediden didn't even find out about McCormick's promotion until after it had occurred. Well, that's what she said, but it's also- But is there any evidence to indicate that, in fact, she did find out about it before it occurred? Well, there is evidence on the record that Thompson relied on Ediden for making promotion decisions. In general? Yes, that is correct, and relied on her to run the unit. And there were continuous negative opinions of Ms. Tellwell to decision-makers, not just to Thompson, but also to the board. And Chu, who is the chair of the board, relied on Ediden's view of Tellwell because he mistrusted Ms. Thompson's opinion. We are saying that when you look at all of that in totality, this is supposed to be a trial by jury, not a trial by summary judgment. You should allow this to be presented to a jury and let them consider it and see whether there is some unlawful consideration at play here. We are not allowed to do that. And that's for the first position. As far as the claim 2 is concerned, she didn't even apply for the job. Well, Your Honor, she wanted to apply, and she was clearly dissuaded from applying. How was she dissuaded? Because- You said that there were four good applicants, but there was nothing that said that she couldn't be a fifth. Well, Your Honor, it was-and, again, that's an issue of intent. How do you analyze that? Mr. Soleil told him how specifically that they've narrowed down-not that there were four-that they've narrowed down to four candidates. Isn't the natural reaction to that if you want the job to rush to get your application in so you can be part of the mix? Well, if you take that into consideration, the circumstances under which she was operating- this is a woman who has already been branded an angry black woman, difficult to work with. She felt it was going to be, you know, futile, you know, to go forward. And besides, she expressed an interest in applying for the position. Your view is she could sue for any job that came available because, having been branded as she was, she knew she couldn't get it and there was no purpose in applying. No, she wanted to apply. In this world, you don't get what you don't ask for. No, no, she wanted to apply and she did ask to- But she didn't apply. Well, she did not because the way she wanted to apply, she was told the field has been narrowed down to four good candidates. And that is enough for a reasonable person to believe that this is going to be futile anyway. If you want a job, the right attitude is to think I'm the best candidate among the four, the five, or the ten. Well- And apply and push. Not when you've been told. What's the point in applying when you've been told that the field has been narrowed down? That is the point here, and you may disagree with her view- We will hear you on rebuttal, sir. Okay, thank you. Over time. Good morning. Good morning, Your Honors. I'm Daniel Monson Brown, Assistant Corporation Counsel on behalf of the appellees. This court should affirm Judge Kodal's grant of summary judgment on the discrimination claims and uphold the jury's verdict, rejecting Ms. Thelwell's retaliation claim. With respect to the first promotion, which Your Honors have discussed at length already, I think a few points are important here. One is that the plaintiff has now conceded that there was no comment about Ms. Thelwell being angry made at any point before the first promotion decision. The only theory of discrimination was based on comments about Ms. Thelwell being angry. Therefore, that claim clearly fails as a matter of law based on that temporal failing alone. Didn't Ms. Monson testify in her deposition that there were negative comments that he did and was making before the promotion, though? Your Honor, that's right. And I think we mentioned that on, I believe, page 41 or 42 of our brief. And I think that that's not competent evidence because that same witness conceded that she, I think, had no direct knowledge of any of such comments, that that was simply her sort of speculation on that point. In the event, negative comments themselves are not a basis for claiming discrimination. Your Honor, right. I think another point that Your Honors touched on is that there's no evidence that Ms. Eden had any impact on this first promotion decision. This decision- What is the nature of the evidence your colleague was referring to about general, in general, Thompson relied on Eden to give reviews of people? What's the nature of that evidence? Your Honor, I think you'll have to direct that question to my colleague because I'm not quite sure what he means by that. But I think that we can look at the evidence showing that Ms. decision was made. Mr. McCormick undisputedly did countless hours of additional work for the board relating to the Occupy Wall Street cases and stop and frisk cases in the Housing Authority buildings. It's undisputed he did this work. It's undisputed he gave reports to the board about this work. It's undisputed that the board thought highly of this work and thought this work very valuable. And it is beyond dispute that members of the board requested or Mr. McCormick in a role that recognizes that additional work and compensate him with a small raise. There's no inconsistency in the record, as my colleague urges here. The executive director, Ms. Thompson, was clear that it was her role as the head of the executive staff to be in charge of promotion decisions. That's completely consistent with the chairman's recollection. Did she also testify or did she testify at all about any contact with Edidin in connection with this promotion? No, Your Honor. The record's clear that Ms. Edidin, I think, was not even informed of this decision, which the plaintiff calls a promotion, but which Mr. McCormick didn't even view as such. He really viewed it as an additional title. One would have thought that that would have been brought out at the deposition. One would think, Your Honor. There's simply no evidence that Ms. Edidin had any role in this first promotion decision. And I think there's a clear contrast with the cases that the plaintiff cites under this cat's paw theory. In each of the cases the plaintiff cites, including where summary judgment for the defendant is affirmed, you always have allegedly discriminatory actors who are writing negative evaluations, which are then expressly considered in the promotion process. Here there's no evidence at all that Ms. Edidin had any role in this first promotion decision. You want to go to the second promotion? Sure, Your Honor. The second promotion decision, I think, has been discussed. It's really not even a close call, nor is the first, to be frank. But this is a position that Ms. Selwell did not apply for. There is nothing in the record to suggest that she even expressed interest in applying, contrary to statements, unsupported statements in Ms. Selwell's brief. The record shows one email in which she reflects on her conversation with Mr. Soleil about how there are four good candidates being identified. There's nothing in that email suggesting that she said she wanted to apply, suggesting any interest in applying. And she expressly testified in her deposition that she remembers nothing else but what isn't reflected in that email. That email is on page A370 of the Joint Appendix. So even if we could somehow forgive Ms. Selwell for not applying and fall back on that situation where there's an unposted position, even though this position was posted, and say, well, she expressed a general interest. There's not even any evidence of that. And finally, on the second promotion, the district court found an alternative. And we argued that the uncontroverted record evidence shows that Mr. McCormick was given the job because he was the best candidate who actually applied. Mr. Soleil testifies at length about why Mr. McCormick was the best candidate for this second promotion. And on reply, the plaintiff doesn't rebut any of that. So there's a second alternative basis for summary judgment on that claim as well. Now turning to the alleged trial errors in which the plaintiff asked this court to overturn the jury's unanimous verdict, rejecting her retaliation claim. Ms. Selwell's retaliation claim is premised on the new executive director drafting and implementing and enforcing a new document retention policy forbidding the destruction of certain agency documents. This policy is put in place largely to protect the rights of criminal defendants. CCRB investigates alleged police misconduct, and there's issues with Brady and concerns like that that would arise if documents were destroyed. Ms. Selwell contends that the creation and implementation and enforcement of that new policy was in fact pretext for retaliating against Ms. Selwell. The jury rejected that claim. What Ms. Selwell wanted to try to throw into the mix at the jury trial was the testimony of Richard Emery that Ms. Katapana Fox was allegedly fired from CCRB for responding too broadly to FOIL requests brought by the Legal Aid Society. It's now clear from the plaintiff's reply that that's what they meant by, quote, leaking documents. You know, between us lawyers and judges here, I think with the knowledge of the law, we're well aware that there's no relationship between how broadly one interprets the state FOIL laws and a desire to not have your agency destroy documents that could be Brady material. Judge Kotal correctly recognized a potential jury confusion that could arise from someone trying to say, well, if that executive director interprets FOIL too broadly and sends too many documents to Legal Aid unredacted, well, that means she doesn't care about document security and her implementation of an anti-shredding policy, you know, was pretextual. At least from where I sit here today, I don't see the connection. I see the great risk of jury confusion, and I also see how this opens the door to a complete sideshow as to the real reasons that Ms. Catapano-Fox left the agency. The final alleged jury error has to do with Mr. Dahl, who was a witness who Ms. Thelwell called, I guess, in hopes that he would testify that people told him to stay away from Ms. Thelwell. He testified at trial that nobody at the agency told him that. And then the plaintiff's counsel attempted to try to refresh Mr. Dahl's recollection on that question that he answered unambiguously. With Mr. Dahl's- His memory was not deficient. His memory was not deficient. And critically, plaintiff's counsel had already told the court multiple times that he would not even mention Mr. Dahl's lawsuit to the jury. So to the extent he's trying to now admit, claim that that lawsuit was admissible, he has not preserved that argument at all. In fact, he's explicitly waived it by telling Judge Kotel, Your Honor, I will not mention that lawsuit. So he tries to use it to refresh recollection. Judge Kotel has a sidebar where he explains how one refreshes a witness's recollection, and plaintiff's counsel doesn't try to do so. So I don't see how that issue is properly before this court. And it cannot be an abuse of discretion for Judge Kotel to have forbidden the use of this document that the plaintiff already affirmatively said he would not show to the jury. Thank you. Thank you. Your rebuttal. You know, first of all, starting with the trial rulings that we have made here, I think counsel is wrong in saying that what was sought to be brought out was evidence that Ms. Katapanu-Fox was interpreting four requests too broadly. What was sought to be brought out clearly was evidence that contrary to her teachings and what she was saying and told the jury, that she was a former federal prosecutor, that she knows what spoliation means and how to maintain records, that she was in fact herself leaking documents and information about police officers to lawyers outside of the agency. Suppose that's true. What's that got to do with it? That is significant. What's that got to do with the destruction of documents? I mean, I didn't see how the evidence was admissible at all. Well, that is central because if you stand up there and say I am an upstanding employee and I am mindful of risk security and information being destroyed, and when you yourself was ultimately fired because you were not doing the things that you were preaching, that is something that will sway the jury and it is very— She was taking a position that she wanted more documents to be disclosed, not fewer. It had nothing to do with— No, no, she was actually leaking documents to outside of the agency. It was leaking documents, but that's not—this is destruction, limiting information. There was no destruction of documents. What happened was that there was a policy that was put in place that was unclear. Everybody admits that. And it was not clear. And my client—it was not clear to most people what the policy was. My client did not fully understand the policy. And not just her. Other people took action. She was singled out and then written up. And the important thing to bear in mind is that at the time that this memo was issued to her, Ms. Kalapano-Fox herself admitted that a lawsuit was bothering her. And that leads to the point about Mr. Doar. Mr. Doar himself came to court, not that his memory was not refreshed, and basically lied contrary to what was in his lawsuit. Wasn't the solution to impeach him instead of to try to refresh his recollection? Well, the solution was to impeach him. We tried to impeach him, and the judge would not let us impeach him. And the judge says we cannot use— I thought you tried to refresh his recollection after he said no. I'm sorry? I thought you tried to refresh his recollection after he said no. Yes. We also tried to cross-examine him and show that he made a previous inconsistent statement, i.e., in his lawsuit, that he was friends with Ms. Telwell. That's why she was fired. And also that even Ms. Kalapano-Fox was bothered by the lawsuit. All of that was not allowed to come in. What that did was to sanitize the trial and make it look like our client was unreasonable, which was not the case. Before you sit down, I have one question. You said earlier that there was evidence that Thompson that it didn't—Thompson in general relied on it didn't regarding recommendations. Yes. I can't find that evidence in the record, so you need to point it out to me. Okay. I see it. There's a statement in your brief on page 12 about it, but the citations that I've read so far after that sentence don't have that evidence. Well, the record is clear that when it comes to decision-making within the investigative division, that the head of that division, which is Ms. Edding at the time, was the one that makes the recommendation and makes the decision on that. There's also testimony that Ms. Edding was actually consulted when it comes to the DEDI position by Mr. Chu. So the point we are making is that when it comes to running that agency, a jury is entitled to hear testimony as to the operations, regardless of what witnesses say during a deposition, which most times they are trying to protect their interest, the interest of the employer. You can't just rely on that and foreclose the reasonable inference that can be drawn from a set of circumstances as to how the agency was being run. We believe that this is a case that should be reversed. We believe that this is a case that is chock-full of disputed facts. The jury should look at it and decide what really happened here. Thank you. Thank you. We'll reserve decision. The case of Hyman v. Cornell University is taken on submission. The case of United States v. Butler is taken on submission. That's the last case on the calendar. Please adjourn court.